**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| **GIL A. MILLER as Receiver for IMPACT PAYMENT SYSTEMS LLC, and IMPACT CASH LLC,** | **MEMORANDUM DECISION AND ORDER GRANTING [29] RECEIVER'S MOTION FOR SUMMARY JUDGMENT AND [50] DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **Plaintiff,** | |
| **vs.** | |
| **ARTHUR S. WULF, an individual,** | **Case No. 1:12-cv-119-DN** |
| **Defendant.** | **Judge David Nuffer** |

Defendant Arthur S. Wulf ("Wulf") is an investor in Impact Payment Systems, LLC and Impact Cash, LLC (together, "Impact"). Plaintiff is the court-appointed receiver in *SEC v. Clark*.[1] The Receiver filed this ancillary action seeking the return as fraudulent transfer, the amount Mr. Wulf received from Impact which exceeds the amount of his original investment together with prejudgment interest. After a careful review of the written memoranda submitted by the parties, oral argument is unnecessary since the motions may be readily decided on the written submissions.[2]

---

[1] Case No. 1:11-cv-46-DN (Impact Payment Systems, LLC and Impact Cash, LLC are named defendants).

[2] *See* DUCivR 7–1(f).

PROCEDURAL BACKGROUND..................................................................................... 2

STATEMENT OF FACTS DEEMED ADMITTED................................................................ 3

ANALYSIS................................................................................................................. 9

    I.    Impact was a Ponzi Scheme........................................................................... 9

    II.    The Ponzi Presumption Applies .................................................................. 12

    III.    Mr. Wulf did not exchange reasonably equivalent value for the amounts he received which exceeded his principal investment with Impact ............................................. 13

    IV.    Prejudgment Interest .................................................................................. 18

ORDER .................................................................................................................... 18

## PROCEDURAL BACKGROUND

On July 17, 2013, the Receiver filed his motion for summary judgment and memorandum in support[3] (the "Receiver's Motion") against Mr. Wulf.  Mr. Wulf filed a motion to stay and a motion to strike the Receiver's Motion,[4] but did not file a substantive response.  On February 28, 2014, Mr. Wulf's motion to stay and motion to strike were denied, and he was ordered to file a response to the Receiver's Motion on or before March 20, 2014.[5]  Mr. Wulf did not file a response by the March 20, 2014 deadline. Accordingly, the Receiver's Motion was granted.[6] Mr. Wulf then filed a motion[7] on April 7, 2014 asking the court to vacate the order granting the

---

[3] Receiver's Motion for Summary Judgment and Memorandum in Support ("Receiver's Motion"), docket no. 29, filed July 17, 2013.

[4] Docket no. 30, filed July 27, 2013; re-filed as an amended motion to stay and motion to strike, docket no. 35, filed August 2, 2013.

[5] Docket text order denying [35] motion to strike; denying [35] motion to stay, docket no. 42.

[6] Memorandum Decision and Order Granting [29] Receiver's Motion for Summary Judgment and Memorandum in Support, docket no. 43, filed March 31, 2014.

[7] Defendant's Motion to Vacate Court's Order and for Relief under FRCP 60, docket no. 44, filed April 7, 2014.

Receiver's Motion because he was out of the country and did not have sufficient opportunity to respond to the Receiver's Motion. Mr. Wulf's request was granted. Mr. Wulf was afforded the opportunity to file his response to the Receiver's Motion on or before May 30, 2014.[8]  Mr. Wulf filed his response on May 29, 2014 ("Wulf's Opposition"), and the Receiver filed a reply to Mr. Wulf's Opposition on June 10, 2014.[9]

On June 10, 2014, Mr. Wulf filed a cross-motion[10] for summary judgment and memorandum in support ("Wulf's Motion").  A memorandum in opposition[11] to Mr. Wulf's Motion was filed by the Receiver on June 23, 2014.  Mr. Wulf did not file a reply.  Mr. Wulf's Motion raises the same or similar arguments as his response to the Receiver's Motion, as such, the two motions are consolidated and determined in this single decision.[12]  After full consideration of all the relevant papers, and as more fully explained herein, the Receiver's Motion is GRANTED and Mr. Wulf's Motion is DENIED. Judgment will be entered accordingly.

## STATEMENT OF FACTS DEEMED ADMITTED

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in

---

[8] Docket Text Order granting in part Wulf's [44] Motion to Vacate Court's Order and for Relief under FRCP 60, docket no. 48, filed May 13, 2014.

[9] Defendant's Response to Receiver's Motion for Summary Judgment, and Defendant's Motion for Summary Judgment ("Wulf's Opposition"), docket no. 49, filed May 29, 2014; Reply in Support of Receiver's Motion for Summary Judgment and Memorandum in Response to Arthur S. Wulf's Motion for Summary Judgment ("Reply in Support"), docket no. 51, June 10, 2014.

[10] Defendant's Motion for Summary Judgment (Wulf's Motion), docket no. 50, filed June 10, 2014.

[11] Memorandum in Opposition to Defendant's Motion for Summary Judgment, docket no. 52, filed June 23, 2014.

[12] This Memorandum Decision and Order makes reference only to the briefing submitted in connection with the Receiver's motion for summary judgment.

the record or showing that the materials cited do not establish the absence of a genuine dispute.[13] The Local Rules of Practice in this district require that a memorandum in opposition to a motion for summary judgment include a concise response to each legal element stated by the moving party and a response to each stated material fact.[14]

> Under each element that a party disputes as having been met, restate each numbered paragraph from the statement of material facts provided in support of that element in the motion. If the fact is undisputed, so state. If a fact is disputed, so state and concisely describe and cite with particularity the evidence on which the non-moving party relies to dispute the fact (without legal argument).[15]

> . . .

> For the purpose of summary judgment, all material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the movant's statement of facts will be deemed admitted unless specifically controverted by the statement of the opposing party identifying and citing to material facts of record meeting the requirements of Fed. R. Civ. P. 56.[16]

Mr. Wulf's Opposition memorandum does not comply with Fed. R. Civ. P. 56(c). Wulf is an attorney proceeding pro se. While pro se pleadings are generally construed liberally, such is not the case for a pro se litigant who is an attorney.[17] Although Wulf asserts that Impact was not operated as a Ponzi scheme, he does not specifically controvert the facts set forth in the Receiver's numbered statement of facts which bear on the Ponzi nature of Impact. Also, Mr.

---

[13] *See* Fed. R. Civ. P. 56(c)(1).

[14] *See* DUCivR 56-1(c).

[15] *Id.*

[16] *Id. See also* *Clark v. Summit Cnty. Sheriff,* 508 F.Supp.2d 929, 932 (D. Utah 2007) (stating that properly supported facts in a summary judgment memorandum, which are not controverted, must be deemed admitted for purposes of the summary judgment inquiry).

[17] *See* *Smith v. Plati,* 258 F.3d 1167, 1174 (10th Cir. 2001).

Wulf cites no facts from the record to challenge the facts presented by the Receiver and fails to

restate each numbered paragraph from the Receiver's statement of material facts.  Given Wulf's

failure to abide by DUCivR 56-1, the following factual statements from the Receiver's Motion

are deemed admitted:

1.      Mr. Wulf invested $60,000 in Impact.[18]

2.      He received $94,500 from Impact.  He therefore received $34,500 more than he

invested.[19]

3.      Gil A. Miller was appointed as Receiver in this matter on March 25, 2011.[20]

4.      Mr. Miller has concluded that Impact was operated with the characteristics of a

Ponzi scheme since at least 2006.[21]

5.      Mr. Miller and the accountants working with him conducted a thorough analysis

of Impact's business operations and its accounting records.  They relied on the

contemporaneously kept records at Impact and on bank records obtained by subpoena.[22]

6.      Impact commingled investor funds through intercompany and inter-account

transfers.[23]

7.      Impact's financial records were not audited by a reputable accounting firm.[24]

---

[18] *See* Receiver's Motion at 2 (Expert Report of David Bateman at 12, dated July 16, 2013 ("Bateman Report"), attached as Exhibit "A" to the Receiver's Motion, docket no. 29-1).

[19] *Id.* (citing Bateman Report at 12–13).

[20] *Id.* at 3 (citing Expert Report of Gil A. Miller at 3, dated July 16, 2013 ("Miller Report"), attached as Exhibit "B" to the Receiver's Motion, docket no. 29-2).

[21] *Id.* (citing Miller Report at 6–12).

[22] *Id.* (citing Bateman Report at 5, and Miller Report at 13).

[23] *Id.* (citing Bateman Report at 5–8).

8.      Although Impact purported to maintain balance records for each investor, those records were inaccurate.  According to an e-mail from one of the accounting employees at Impact to Scott Clark, many of the investor accounts should have had negative cash balances.  At the time of his e-mail, August 9, 2010, there was a total negative balance of more than $8.3 million.[25]

9.      In order to make distributions to investors who had a negative balance, Impact's accountants would book entries in the accounting records labeled as "temp loans," effectively taking money that had been accounted for as belonging to one investor and paying it to another. In reality, no transfer of funds was necessary as all of the money was in a single account.[26]

10.      Tori Jackson, who filled an accounting position with Impact, testified that distributions were sent to investors even when companies had negative balances.[27]

11.      Impact Payment Systems had losses totaling $1,056,055 as of December 31, 2009.[28]

12.      Impact and its related companies did not show an operating profit in any year when distributions to investors were made. The Impact entities realized a collective net loss of nearly $3 million during that time.[29]  Nevertheless, they distributed over $52.6 million.[30]

---

[24] *Id.* at 4 (citing Miller Report at pages 10–11).

[25] *Id.* (citing Miller Report at 8, fn. 11).

[26] *Id.*

[27] *Id.* (citing Deposition of Tori Jackson Beutler at 123, line 10, dated May 9, 2011, relevant portions attached as Exhibit "C" to the Receiver's Motion, docket no. 29-3).

[28] *Id.* (citing Bateman Report at 8).

[29] *Id* at 5 (citing Bateman Report at 11).

[30] *Id.*

13.     When Impact's records include an appropriate bad debt adjustment, none of the $52.6 million in payments could have been made with operating profits.  The only source for these distributions was from principal invested by other investors.[31]

14.     Dirk Pace, an Impact accounting employee, testified that since he was hired by the company in September 2008, it recorded a loss each year and used investor money to cover those losses.[32]

15.     One of Impact's accountants, Brandon Cowley, testified in his deposition that new investor money that was supposed to be used to fund payday loans came into Impact accounts and left the accounts within the same week to pay out old investors who had requested dividend payments or liquidation proceeds.[33]

16.     Impact investors were promised large returns for their investments. Some investors were promised up to an 80% annual return.  Others were told they would double their money in a year, or even within months. Investors were typically led to believe they were making between 30 and 40 percent in annual returns.[34]

17.     Impact used investor funds that were supposed to be used for payday loans to cover expenses.[35]

18.     Impact used investor funds to support Mr. Clark's standard of living.[36]

---

[31] *Id.*

[32] *Id.* (citing Deposition of Dirk Pace at 17, line 12, dated October 7, 2011, relevant portions attached as Exhibit "D" to the Receiver's Motion, docket no. 29-4).

[33] *Id.* (citing Deposition of Brandon Cowley at 28, line 14, dated May 24, 2011, relevant portions attached as Exhibit "E" to the Receiver's Motion, docket no. 29-5).

[34] *Id.* at 6 (citing Miller Report at 8).

[35] *Id*. (citing Miller Report at 10).

19.     One person, Scott Clark, was principally responsible for Impact's operations.[37]

Mr. Wulf has failed to raise a genuine issue of material fact which would require a trial. In addition, based on the following legal analysis, it is clear that the Receiver is entitled to judgment as a matter of law.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38] When analyzing a motion for summary judgment, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[39] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[40] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[41]

---

[36] *Id.*

[37] *Id.* (citing Miller Report at 11).

[38] Fed. R. Civ. P. 56(a).

[39] *Mathews v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1204 (10th Cir. 2011) (citation and internal quotations omitted).

[40] *Ford v. Pryor,* 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[41] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

## ANALYSIS

### I.        Impact was a Ponzi Scheme

Previous opinions have found, relying on the same evidence presented by the Receiver here, that Impact was operated as a Ponzi scheme.[42]  Mr. Wulf has offered no evidentiary facts to rebut the previous findings, or offered any reason to depart from the earlier determination.  The undisputed facts of the Receiver's Motion establish that Impact was a Ponzi scheme.

Mr. Wulf's principal argument is that Impact cannot have been a Ponzi scheme because it operated a real business.[43] This misses the point. "[S]eemingly legitimate business activity does not insulate companies from a finding that they were operated as part of a Ponzi scheme."[44] Ponzi schemes sometimes use legitimate operations to attract investors, but the existence of that legitimate business does not preclude a finding that the company operated a Ponzi scheme.[45]  In *Scholes v. Lehmann,*[46] a similar argument was analyzed and rejected. The *Scholes* court stated: "It is no answer that some or for that matter all of Phillip's profit may have come from

---

[42] *See* Order on Receiver's Motion to Approve Plan of Distribution at 4, ¶ 4, filed May 11, 2012 in *SEC v. Clark*, Case No. 1:11-cv-46-DN, docket no. 184 ("The Receiver has established that prior to the Receiver's appointment that Impact was operated as a Ponzi scheme."); Order at 2, filed April 10, 2013 in *SEC v. Clark*, Case No. 1:11-cv-46-DN, docket no. 360 (stating that "the elements of a Ponzi scheme have been established and the court will not revisit this issue.").

[43] *See* Wulf's Opposition at 3.

[44] *See Wing v. Layton*, 957 F. Supp. 2d 1307, 1315 (D. Utah 2013).

[45] *See, e.g., Jobin v. McKay (In re M&L Business Machine Co.)*, 84 F.3d 1330, 1332 (10th Cir. 1996) (Ponzi scheme existed where its perpetrator used the company's legitimate operations as a computer sales and leasing company as a front); *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir. 1996) (Ponzi scheme existed in partnership hedge fund where "trading resulted in net profits in a few years," though "in most years the Hedged Investments operation realized net trading losses.").

[46] 56 F.3d 750 (7th Cir. 1995).

'legitimate' trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations."[47]

The undisputed facts establish that Impact used new investor money to pay returns to older investors. It paid over $52 million to investors (including Mr. Wulf) even though it never made a profit from its business operations. When a company pays existing investors at a time when it is not generating a profit, the money used to pay returns must come from loans or from new investors. There is no evidence that the money Impact paid to old investors came from loans. The Receiver's analysis of Impacts records, and the undisputed facts, demonstrates those returns came from new investors.

Payment of new investor money to old investors is the *sine qua non* of a Ponzi scheme.[48] The Tenth Circuit has defined a Ponzi scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."[49]  Because Impact never operated at a profit, returns to investors were taken from principal sums of newly attracted investments.

It is simply no answer that Impact had assets and an operating business.  There need not be a finding that Impact was asset-less from day one in order to find it operated as a Ponzi scheme.  The Receiver's undisputed evidence shows returns to investors were funded by new investment capital, not by profits of Impact's business.  This is sufficient under the Tenth Circuit's definition to find that Impact was operated as a Ponzi scheme.

---

[47] *Id.* at 757.

[48] *See Sender v. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.,)* 48 F.3d 470, 476 (10th Cir. 1995).

[49] *In re M&L Business Machine Co., Inc.,* 84 F.3d at 1332, n. 1 (citation omitted).

Mr. Wulf also argues that Impact was not insolvent.[50]  As a matter of law, a Ponzi scheme is insolvent from its inception because as it takes in money from new investors, it incurs increased debt to those investors.[51] When it uses that money to pay old investors, it retains nothing of value, so its insolvency is perpetually deepening. Thus, when Mr. Wulf says that Impact paid investors $52 million over time,[52] that is not evidence that Impact was solvent, but that it was digging itself deeper into insolvency. Mr. Wulf ignores an essential part of the equation: the $52 million was not paid solely from proceeds of Impact's payday loans, but from new investors' infusions of cash. The Receiver's evidence of insolvency is ample and unrebutted by Mr. Wulf.

Mr. Wulf also argues that Impact must have been solvent because its assets were sold for $25 million.[53] However, the value of a company's assets is not determinative of its solvency. Solvency measures the value of a company's assets against the magnitude of its indebtedness. Under the Utah Uniform Fraudulent Transfer Act ("UUFTA"), because Impact owed debts which exceeded its assets, it was insolvent.[54]

In addition to its insolvency and payment of obligations to existing investors with new investor money, Impact commingled its assets. Mr. Wulf argued that this is irrelevant to the question of whether it was a Ponzi scheme. The Tenth Circuit disagrees. Commingling of investor funds is evidence of a Ponzi scheme because commingling makes fund tracing

---

[50] *See* Wulf Opposition at 6.

[51] *See Scholes,* 56 F.3d at 755.

[52] *See* Wulf Opposition at 6.

[53] *Id.* at 6–7.

[54] Utah Code Ann. § 25-6-3(1).

impossible.[55]  When a company commingles funds and operates at a loss while continuing to pay the old investors, the money to pay the old investors necessarily comes from new investments. Impact operated as a Ponzi scheme.

## II.        The Ponzi Presumption Applies

The UUFTA provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor".[56]

Under UUFTA, once it is established that a debtor acted as a Ponzi scheme, all transfers by that entity are presumed fraudulent.[57]  "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."[58]  The Ponzi presumption is not limited to those cases where the company is asset-less from day one.  It applies whenever a company has operated an investment scheme and used new investor money to pay older investors.[59]

---

[55] *See In re Hedged-Invs. Assocs., Inc.*, 48 F.3d at 474.

[56] Utah Code Ann. § 25-6-5(1)(a).

[57] *See Wing v. Dockstader*, 482 Fed.Appx. 361, 363 (10th Cir. 2012) (citing *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[58] *Wing v. Gillis*, No. 2:09-cv-314, 2012 WL 994394, at *2 (D.Utah Mar. 22, 2012), *aff'd*, No. 12-4071, 2013 WL 2169321 (10th Cir. May 21, 2013).

[59] *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.").

The Receiver's burden of proving actual intent on summary judgment is conclusively established by proving the entities under his control were operated as a Ponzi scheme.[60] Here, it is undisputed that Impact operated as a Ponzi scheme. The Ponzi presumption, therefore, applies and the Receiver has met his burden.

### III.   Mr. Wulf did not exchange reasonably equivalent value for the amounts he received which exceeded his principal investment with Impact

Under UUFTA, a transfer is not voidable against a person who took in good faith and for reasonably equivalent value.[61]  The burden is on the recipient of funds from a Ponzi scheme to establish both the element of good faith and the element of reasonably equivalent value.[62]   It is well established that an investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments.[63]  Mr. Wulf does not dispute that he received $34,500 more than he invested in Impact. He argues instead that he should not be liable because he purchased stock in Impact (instead of simply investing for a return on profits) and subsequently redeemed his stock at its fair market value in an arm's length transaction.[64]  In

---

[60] *See Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995)).

[61] *See* Utah Code Ann. § 25-6-9.

[62] *See Klein v. King & King & Jones, P.C.,* No. 2:12-cv-00051, 2013 WL 4498831, *2 (D.Utah Aug. 19, 2013) (unpublished)* ("Good faith and reasonably equivalent value are independent components of this affirmative defense, and the burden is upon the Defendant to establish both the element of good faith and the element of value." ).

[63] *Scholes*, 56 F.3d 750; *Wing v. Dockstader,* 482 Fed. Appx. 361 (10th Cir. 2012); *Donell v. Kowell*, 553 F.3d 762 (9th Cir. 2008).

[64] Wulf's Opposition at 10–11, 16.

13

a Ponzi scheme, there is no distinction between money invested as debt and money invested as equity.[65] Mr. Wulf's argument fails to meet his burden.

Mr. Clark misled all of Impact's investors. Treating all defrauded investors equally best furthers the purposes of a federal equity receivership. In the case involving Charles Ponzi, *Cunningham v. Brown,*[66] the Supreme Court concluded that "the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them."[67] Rather, the court looked at the reality of the situation, concluding that Mr. Ponzi's victims "were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. . . . It is a case the circumstances of which call strongly for the principle that equality is equity."[68]

Cases acknowledge that there is no difference in a Ponzi context between debt and equity investors. These cases include *Perkins v. Haines*[69] and *In re AFI Holding, Inc.*[70] "The general rule applies in a Ponzi scheme setting regardless of whether good faith investors have an equity interest in, or some other form of claim against, the legal entity constituting the instrument of the fraud."[71] Under *In re AFI Holding, Inc.* and the general rule, *Perkins* holds, later transfers up to

---

[65] *Perkins v. Haines*, 661 F.3d 623, 628 (11th Cir. 2011) (holding that "no court has distinguished between equity investments and debt-based claims when applying the general rule to fraudulent transfer actions arising out of a Ponzi scheme.").

[66] 265 U.S. 1, 44 S.Ct. 424 (1924).

[67] *Id.* at 13.

[68] *Id.*

[69] 661 F.3d 623 (11th Cir. 2011).

[70] 525 F.3d 700 (9th Cir. 2008).

[71] *Perkins,* 661 F.3d at 628–629 (citing *In re AFI Holding, Inc.*, 525 F.3d at 708).

the amount of the investment provided value. But no value is given for payments in excess of principal.[72]

Mr. Wulf argues that *Perkins* is distinguishable because the investors there were limited partners, not shareholders.[73]  This argument is unavailing.  *Perkins* makes clear that the general rule applies to all investors in a Ponzi scheme.[74]  Mr. Wulf also says he never received any profits from Impact.[75]  But he does not deny that he received $34,500 more from Impact than he invested.  It does not matter whether this additional money is labeled "interest" or "profit," or, as Mr. Wulf calls it, a "premium" or a "dividend."[76]  All transfers which exceed the amount of an investor's investment are considered "fictitious profits" and are not made for "value" because they exceed the scope of the investors' fraud claim against the perpetrator of the Ponzi scheme. Those transfers are therefore subject to recovery by a receiver.[77]

*Perkins* is different from this case in one way. In *Perkins,* the bankruptcy trustee sought the return of the investors' entire investments. The trustee argued that he should be entitled to the return of all payments because, since stock in a Ponzi scheme is worthless, payments for that stock confer no value.[78]  The court disagreed, and allowed the investor to keep returns up to the amount of his principal investment. The Eleventh Circuit agreed with the trustee that, typically,

---

[72] *Id.*

[73] *See* Wulf Opposition at 9.

[74] *Perkins*, 661 F.3d at 627–628.

[75] Wulf's Opposition at 9–10.

[76] *Id.* at 10.

[77] *See Perkins*, 661 F.3d at 627 (citing the Tenth Circuit's opinion in *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d at 1290).

[78] *See id.* at 627–628.

transfers to redeem an equity investment in an insolvent entity (initially made free of fraud) cannot constitute transfer for value because the stock returned to the corporations as part of the exchange was virtually worthless.[79] But a Ponzi scheme is different. In a Ponzi scheme, all of the investors—whether debt or equity—have been defrauded and should be treated the same. The court in *Perkins* thus concluded that

> no court has distinguished between equity investments and debt-based claims when applying the general rule to fraudulent transfer actions arising out of a Ponzi scheme. To the contrary, the Ninth Circuit—the only court of appeals to address this issue to date—applied the general rule to equity investors in a Ponzi scheme, and rejected any attempts to distinguish between the forms of the investment.[80]

Mr. Wulf accuses the Receiver and his counsel of deliberately misrepresenting *Perkins* and *In re AFI Holding, Inc.*[81] However, the Receiver's reading of *Perkins* and *In re AFI Holding, Inc.* is accurate.

Mr. Wulf argues he is not a defrauded investor but simply a disgruntled stockholder who Impact bought out.[82] But the reasoning of *In re AFI Holding, Inc.* and *Perkins* is that all investors in a Ponzi scheme (specifically, those who did not conspire in the scheme) are defrauded creditors and hold claims against the perpetrator of the fraudulent scheme, either in tort law or

---

[79] *Id.*

[80] *Id.* at 628 (citing *In re AFI Holding, Inc.*, 525 F.3d at 708–09).

[81] *See* Wulf Opposition at 8.

[82] *Id.* at 10–11.

through some sort of contractual arrangement. Hence, Mr. Wulf is considered a "creditor" and the Ponzi scheme operator is the "debtor."[83]

Mr. Wulf points out that only after Impact failed to make its current dividend payments did he demand that his stock be redeemed, at which point he redeemed his stock at its fair market value in an arm's length transaction with Mr. Clark.[84]   However, in determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer.[85]   In other words, the question is not whether Mr. Wulf "gave reasonably equivalent value; it is whether [Impact] received reasonably equivalent value."[86] Here, Impact did not receive reasonably equivalent value from the redeemed stock (above Mr. Wulf's initial investment of $60,000), as the stock that was returned was virtually worthless due to the insolvency of the Ponzi scheme.[87]

---

[83] *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008) ("The Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.'").

[84] Wulf's Opposition at 10, 16.

[85] *See In re Lucas Dallas, Inc.,* 185 B.R. 801 (9th Cir.1995); *Klein v. McGraw*, No. 2:12-CV-00102-BSJ, 2014 WL 1492970, at *8–9 (D. Utah Apr. 15, 2014) (finding that creditor's preparation of spreadsheet reports which he gave to the debtor was not reasonably equivalent value provided to the debtor, and the reports served to further the debtor's fraudulent activities).

[86] *Id.* at 807.

[87] See *Cunningham v. Brown,* 265 U.S. 1, 8, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (stating that due to the nature of his scheme, Charles Ponzi "was always insolvent, and became daily more so, the more his business succeeded."); *Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir.2006) ("a Ponzi scheme . . . is, as a matter of law, insolvent from its inception."); *In re Financial Fed. Title & Trust, Inc.,* 309 F.3d 1325, 1332 (11th Cir. 2002) (noting that by definition a Ponzi scheme is driven further into insolvency with each transaction); *In re Indep. Clearing House Co.,* 77 B.R. 843, 871 (Bankr. N.D. Utah 1987) ("By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one.").

## IV.     Prejudgment Interest

An award of prejudgment interest in the amount of 5% starting from the date of the last transfer of funds from Impact to Mr. Wulf is appropriate here, in order to compensate the receivership estate for the loss of the use of those funds.[88]

### ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment[89] is GRANTED;

IT IS FURTHER ORDERED that the Receiver shall submit a proposed judgment against Arthur S. Wulf in the amount of $34,500, together with prejudgment interest at the appropriate rate through the date of this order, and post judgment interest accruing at the statutory rate; and

IT IS FURTHER ORDERED that defendant Wulf's Motion for Summary Judgment[90] is DENIED.

Dated February 2, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[88] *See Wing v. Gillis,* No. 12:4071, 525 Fed.Appx. 795, 801–02 (10th Cir. 2013) (unpublished) (affirming a 5% per annum prejudgment interest rate in a case that involved fraudulent transfer claims against defendant investors in an equity receivership, who received more than their principal investment in an entity that was operated as a Ponzi scheme).

[89] Docket no. 29.

[90] Docket no. 50.